CAS CONSTRUCTION COMPANY, INC. *v.* TOWN OF EAST HARTFORD
(AC 23143)

Dranginis, Bishop and McLachlan, Js.

Argued December 3, 2003—officially released April 20, 2004

*Lawrence G. Rosenthal,* for the appellant (plaintiff).

*Richard M. Quinlan,* assistant corporation counsel, for the appellee (defendant).

*Opinion*

BISHOP, J. This appeal arises from the trial of a dispute involving a road reconstruction project in East

Hartford. On May 21, 1997, the plaintiff, CAS Construction Company, Inc., entered into a written contract with the defendant town of East Hartford for the reconstruction of Forest Street. The project was funded by the department of transportation.[1] Pursuant to the contract, the plaintiff agreed to remove and to replace the storm drainage systems under Forest Street, and the defendant agreed, in return, to pay for the plaintiff's services on the basis of the unit prices contained in the defendant's solicitation of bids.[2]

Work on the project began in June, 1997, and was completed by June, 1998. A dispute arose after the defendant rejected several requisitions submitted by the plaintiff for payment for various units of work. Thereafter, the plaintiff commenced this action. In count one of its complaint, the plaintiff alleged breach of contract for failure to make payments in excess of $71,729.90 for work contained in the contract specifications. In count two, the plaintiff claimed nonpayment in an amount exceeding $105,204.17 for extra work not contained in the contract specifications. In count three, the plaintiff alleged delays to contract performance caused by the defendant that resulted in additional unspecified costs to the plaintiff. In response, the defendant denied that the amounts claimed were due and filed five special defenses.[3]

---

[1] The contract incorporated by reference the department of transportation's Standard Specifications for Roads, Bridges and Incidental Construction, Form 814A (1995).

[2] In a unit price contract, the contractor's bid is not determined as a single overall price, but is an accumulation of costs for each unit item of work, the submitted bid being subsequently determined by the number of such units required under the bid specifications and to be installed by the contractor. See *Maskel Construction Co.* v. *Glastonbury*, 158 Conn. 592, 593–94, 264 A.2d 557 (1969).

[3] In its special defenses, the defendant claimed that (1) the plaintiff had failed to provide proper invoices as required under the contract (first special defense), (2) the plaintiff's own actions had contributed to the alleged delays (second special defense), (3) the defendant had no obligation to pay subcontractors (third special defense), (4) the plaintiff had not submitted a certified

After a trial to the court, judgment was rendered for the plaintiff on counts one and two of the complaint in the amounts of $28,722 and $5008.28, respectively. Judgment was rendered for the defendant on count three.

On appeal, the plaintiff claims that the court improperly (1) interpreted the parties' contract by concluding that the plaintiff was not entitled to additional compensation for (A) remobilization costs associated with the defendant's suspension of work, (B) costs associated with the reconnection of pipes to the newly installed catch basins and (C) services provided by the plaintiff beyond the contractual hours of operation; (2) found that the plaintiff failed to prove its damages with reasonable certainty; and (3) concluded that the defendant was not liable for compensation claimed by the plaintiff for the extra costs incurred by a subcontractor. We affirm the judgment of the trial court. Additional facts will be set forth as necessary.

I

The plaintiff's first claim is that the court improperly interpreted the contract by concluding that the plaintiff was not entitled to additional compensation because (A) the contract provisions governing the suspension of work encompassed a provision for making a claim for remobilization costs, (B) the contract unit price for each catch basin included the costs incurred by the plaintiff in reconnecting the pipes to the catch basins and (C) the contract limited the paid hours of operation.

A

The plaintiff challenges the court's conclusion that the contract barred its claim for additional compensa-

statement as to the items of work completed (fourth special defense) and (5) the plaintiff had failed to pay its subcontractors from the proceeds it received from the defendant (fifth special defense).

tion for the costs associated with the defendant's suspension of work.

The following additional facts are relevant to our disposition of the plaintiff's claim. On November 24, 1997, the defendant notified the plaintiff that it was suspending work on the project for the winter months and that the project was to resume no later than April 1, 1998. In its complaint, the plaintiff alleged that it suffered monetary damages as a result of the suspension. Specifically, the plaintiff alleged that as a result of the defendant's suspension of work, all of its equipment from the site was "demobilized" and in April, when the project resumed, it had to "remobilize" the equipment again. At trial, the plaintiff claimed that this "remobilization" cost it an additional $20,000.

The court denied the plaintiff's claim for remobilization costs and, in its memorandum of decision, stated: "[T]he defendant acted reasonably, lawfully and in accordance with the rules and procedures authorizing a winter closure. The plaintiff failed to conform to CT DOT Form 814A, § 1.08.06, and did not submit '. . . to [the defendant], in writing, a request for a contract adjustment within seven calendar days of receipt of a notice to resume work.'"

On appeal, the plaintiff contends that the court improperly applied the contractual requirements of the suspension of work provisions to its claim for remobilization costs. We are not persuaded.

We begin by articulating the appropriate standard of review. In the present case, the parties do not dispute that the interpretation of the language of § 1.08.06 of the contract's Standard Specifications for Roads, Bridges and Incidental Construction, Form 814A (1995) (Standard Specifications), as promulgated by the department of transportation, presents a question of law over which we exercise plenary review. "[W]here

there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . [B]ecause the trial court relied solely upon the written [agreement] in ascertaining the intent of the parties, the legal inferences properly to be drawn from the [document is a] question of law, rather than fact." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 227, 828 A.2d 64 (2003).

The plaintiff contends that the court misconstrued the contract in concluding that the defendant was entitled to order a winter shutdown. On appeal, however, the plaintiff acknowledges that the defendant was, in fact, entitled to order a suspension of work. In that regard, the plaintiff's brief states in relevant part: "The contract terms were clear, [the plaintiff] was to proceed with work with no winter shutdown. [The defendant] decided to suspend the Project. [The defendant] has a contractual right to suspend the work (CTDOT 814A, Section 1.08.06 . . .) but it must pay [the plaintiff] for the costs of such a suspension, such as idle equipment, utility and rental costs."

The plaintiff's acknowledgment that the defendant was entitled to order a shutdown of the work is correct. The contract language at issue unambiguously provides that the parties intended to give the defendant the authority to suspend work under certain circumstances.[4] Accordingly, we conclude that the court's con-

---

[4] Section 1.08.06 of the contract, entitled "Suspensions of Work Ordered by the Engineer," provides in relevant part: "The Engineer shall have the authority to suspend the work wholly or in part, for such period or periods as he considers to be in the best interests of the State, or in the interest of public necessity, convenience or safety. . . . (1) If the performance of all or any portion of the work is suspended or delayed by the Engineer in writing for an unreasonable period of time (not originally anticipated, customary, or inherent to the construction industry) and the Contractor believes that additional compensation and/or Contract time due as result of such suspension or delay, the Contractor shall submit to the Engineer in writing a request for a Contract adjustment within 7 Calendar days of receipt of the notice to resume work. The request shall set forth the specific reasons and support

clusion that the defendant was entitled to suspend work on the project during the winter months was legally correct.[5]

The plaintiff also challenges the court's conclusion that it was not entitled to recover the extra remobilization costs it incurred because it did not submit to the defendant a written request for a contract adjustment within seven calendar days of the plaintiff's receipt of the defendant's notice to resume work. The plaintiff contends that even if the defendant had the contractual right to order the suspension of work, the plaintiff was entitled to recover the additional costs it incurred in remobilizing its equipment regardless of whether it submitted a timely written request for additional compensation. In support of that contention, the plaintiff posits that the court incorrectly relied on § 1.08.06 of the contract specifications. According to the plaintiff, a cost adjustment was provided for in the contract because the contract contained a unit price line item for mobilization. The plaintiff further argues that because the requirements of § 1.08.06 (3) do not apply if a cost adjustment already is provided for under any other term of the contract, it was not required to make a written request for an adjustment within the time specified. In sum, the plaintiff claims that the provision for mobilization costs in the contract assured it payment for remobilization costs and without the necessity of a timely supplemental requisition. We disagree.

The contract provided a $20,000 lump sum line item for "mobilization." It did not, however, provide a lump sum line item for "remobilization." Because there was

for such adjustment. . . . (3) No Contract adjustment will be allowed unless the Contractor has submitted the request for adjustment within the time prescribed."

[5] Notably, the plaintiff makes no claim challenging the court's conclusion that the defendant's reason for suspending work, i.e., the onset of winter, was not authorized by § 1.08.06 (1) of the contract.

no line item for "remobilization," the court correctly determined that the plaintiff's claim for remobilization was, in fact, one for "extra costs" incurred during the defendant's suspension of work. Thus, it was governed by the requirements of § 1.08.06 of the contract. Section 1.08.06 (1) provides that if the plaintiff believes that additional compensation is due as a result of the defendant's suspension of work, the plaintiff must "submit to the [defendant] in writing a request for a Contract adjustment within 7 calendar days of receipt of notice to resume work. . . ." Section 1.08.06 (3) further provides that "[n]o Contract adjustment will be allowed unless the Contractor has submitted the request for adjustment within the time prescribed." The court's determination that the plaintiff's claim for remobilization costs would be denied unless it filed a request for adjustment within the specified time is, therefore, legally correct.[6]

Because we conclude that the court's conclusions were legally and logically correct and find support in the record, the plaintiff's first argument is unavailing.

B

The plaintiff next challenges the court's interpretation of the contract provisions concerning the plaintiff's installation of catch basins.

The following additional facts are pertinent to our discussion of the plaintiff's claim. As previously stated, the purpose of the project was to remove and to replace the existing storm drainage system under Forest Street. To fulfill its obligation under the contract, the plaintiff was required to replace a number of the existing catch

---

[6] We note that the plaintiff does not challenge the court's factual finding that the plaintiff failed to comply with the requirements of the subject provision.

basins.[7] To do so, the plaintiff had to disconnect the pipes from the old catch basins, install the new catch basins and then reconnect the pipes to the newly installed catch basins.

Section 5.07 of the Standard Specifications governed the installation of those catch basins and designated the work that was to be included in the contract unit price for each catch basin. It provides in relevant part: "Catch Basins . . . will be paid for at the contract unit price . . . for . . . 'Catch Basin,' of the type specified . . . *complete in place*, which price shall include all materials, equipment, tools, and *labor incidental thereto*." (Emphasis added.) That provision does not, however, expressly include the reconnection of pipes in the contract unit price for catch basins.

At trial, the plaintiff alleged that it is entitled to $37,100 for its reconnection of the pipes to the newly installed catch basins. The plaintiff claims that because the contract did not expressly provide for the reconnection of pipes, such services were "extra work" as defined in § 1.04.05 of the contract, and, thus, it was entitled to additional compensation for such work. Section 1.04.05, entitled "Extra Work," allows for additional compensation for work performed by the plaintiff that is necessary to complete an improvement for which no price is provided in the contract. The defendant, however, contended that those services were not "extra work," but rather were included in the work to be performed under the contract, and because it already had paid the contract unit price for each catch basin, it was not liable for them.

Agreeing with the defendant, the court denied the plaintiff's claim, stating in its memorandum of decision: "Nothing should be more apparent than when it

---

[7] A catch basin is a subterranean chamber or well that admits surface water for discharge into a storm drain system.

becomes necessary to disconnect existing pipes to replace a catch basin, the existing pipes would have to be reconnected to the new catch basins. The court expressly finds that this item was an integral and essential element of the contract and that the plaintiff is owed no further payments for same."

On appeal, the plaintiff claims that the court's interpretation of the contract was incorrect because the reconnection of pipes was not expressly included in the work to be performed by the plaintiff under the agreement. We disagree.

We begin our analysis by reiterating the legal framework that governs our review. As previously stated, the question of contract interpretation is a question of the parties' intent. *Grass* v. *Grass*, 47 Conn. App. 657, 662, 706 A.2d 1369 (1998). Ordinarily, that is a question of fact. Id. If, however, the language of the contract is clear and unambiguous, the court's determination of what the parties intended in using such language is a conclusion of law. Id. "In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Internal quotation marks omitted.) Id.

In the present case, § 5.07.05 of the contract's Standard Specifications contains language concerning the contract unit price of each catch basin. It provides in relevant part: "These structures will be paid for as follows . . . . Catch Basins . . . *complete in place*, which price shall include all materials, equipment, tools and *labor incidental thereto*. . . ." (Emphasis added.) Although that language is broad and enveloping, when read in the context of the entire contract, it is also amply plain. It conveys a palpable intent to include the plaintiff's "reconnection of pipes" as labor incidental to the installation of each catch basin. See *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 729, 682 A.2d 1026

(" 'law is clear that a contract includes not only what is expressly stated therein but also what is necessarily implied from the language used' "), cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

We reach that conclusion by considering the contractual language in light of the purpose the parties sought to accomplish in making the contract. The contract provided for the removal and replacement of the storm drainage system existing under Forest Street, which included the replacement of existing catch basins. Pursuant to § 5.07.05 of the contract, each catch basin would be paid for if "complete in place . . . ." The function of each catch basin is to admit surface water and to discharge it into the storm drainage system. That function cannot be accomplished if the previously disconnected pipes are not reconnected. A catch basin could not, therefore, be "complete in place" unless the pipes were reconnected to it. Viewed against that backdrop, it is apparent that the contract permits only one reasonable interpretation in that regard. To construe it otherwise—that a catch basin is "complete in place" even if the outlet pipes are disconnected—would make nonsense of plain language. See *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 674, 791 A.2d 546 (2002) ("law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous"). We therefore conclude that the language of the contract is unambiguous and, as a consequence, our review of the court's interpretive determinations concerning such language is plenary.

Accordingly, we apply the well established principle of contract interpretation that contracts are construed in accordance with what we conclude to be the understanding and intention of the parties as determined from the language they used interpreted in the light of their situation and the circumstances connected with the

transaction. When, as here, the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. According to the plain language of the contract, the plaintiff's reconnection of the pipes to the newly installed catch basins is encompassed by § 5.07 as labor incidental to the complete installation of each catch basin and is, therefore, included in the contract unit price of each catch basin. The court's interpretive determination in that regard was, therefore, legally and logically correct. Consequently, the plaintiff's second claim fails.

### C

The plaintiff's third claim regarding extra payment for work beyond the contracted hours of work is similarly unavailing. Pursuant to § 9.70.01 of the Standard Specifications, the plaintiff was required to provide the services of "uniformed trafficmen" (trafficmen) at the construction site to control and direct vehicular traffic and pedestrians. According to that provision, payment for those services would be measured by the hours of service rendered. Section 9.70.04, however, further provides in relevant part that "[t]rafficmen furnished by the Contractor . . . beyond the period for which the Engineer deems such trafficmen necessary to the proper completion of the project . . . will not be measured for payment."[8] Section 1.08 of the contract restricted the necessary working hours of the trafficmen to a specified period of time.[9]

---

[8] Section 9.70.04 provides in relevant part: "Services of trafficmen will be measured for payment by the number of hours for each person rendering services in accordance with the orders of the Engineer. . . . Trafficmen furnished by the Contractor . . . beyond the period for which the Engineer deems such trafficmen necessary to the proper completion of the project . . . will not be measured for payment."

[9] Section 1.08 provides in relevant part that "the Contractor shall not be permitted to perform any work which will interfere with normal traffic operations on Forest Street during the following periods: On Monday through Friday between 6 a.m. and 9 a.m. and between 3 p.m. and 6 p.m."

At trial, the plaintiff claimed that the defendant breached the contract by paying only for the services of the trafficmen rendered between the contractual start of the workday and the contractual end of the workday, and by refusing to pay for the work performed by the trafficmen beyond the hours of work set forth in the contract. The court concluded, however, that the defendant had no obligation to pay for those extra services, as they were "outside the parameters of the working hours as set forth in the contract."

On appeal, the plaintiff asserts that the court's conclusion was incorrect because the contract cannot be interpreted as limiting the paid hours of operation.

Because the contract contained definitive language concerning the issue, our review of the court's conclusion that the defendant had no contractual obligation to pay for the extra services of the traffic control officers is plenary. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 227.

"Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Fusco* v. *Fusco*, 266 Conn. 649, 655, 835 A.2d 6 (2003). As previously stated, § 9.70.04 of the contract explicitly provides in relevant part that "[t]rafficmen furnished by the [plaintiff] . . . beyond the period for which the [defendant] deems such trafficmen necessary . . . will not be measured for payment." The contract defined the period for which such trafficmen were necessary in an express provision entitled, "Limitation of Operations." When read together, those provisions clearly establish that the parties intended that any work performed by trafficmen outside of the period specified by the "Limitations of Operations" would not be paid by the defendant. Consequently, the court's determination that the plaintiff was not entitled to be paid for work

performed by trafficmen outside the working hours specified in the contract was legally and logically correct. Accordingly, the plaintiff's third challenge must also fail.

## II

The plaintiff next assails the court's factual findings that led it to the conclusion that the plaintiff's damages were not proven with reasonable certainty. The plaintiff contends that the evidence it adduced to meet its burden of proof was sufficient. We disagree. Because the plaintiff is challenging the court's factual findings, our review is limited to deciding whether such findings are clearly erroneous. See *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 539, 767 A.2d 1169 (2001).

"Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 308–309, 685 A.2d 305 (1996). Thus, "[t]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *Bronson & Townsend Co.* v. *Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974).

In its memorandum of decision, the court stated: "Items 1, 6, 7 and 8. Gas main obstruction. The plaintiff's claim that for these items it is owed $13,025.56. . . . [T]he plaintiff did not offer any documented proof, but relied on its subjective and speculative opinion as to cost. The court expressly finds that the plaintiff has failed to prove its claims under items 1, 6, 7 and 8. . . . Item 28, 29. Topsoil and turf establishment. The plaintiff claims that the [defendant] owes $1631 for topsoil that was needed in an area near Oak Street and is owed

$2260 for seeding. The plaintiff has provided no documentation or detail, and relies on its subjective and speculative opinion as to these items. The [defendant] cannot pay these claims."

On the basis of our thorough review of the record, we conclude that the court's determination that the plaintiff failed to adduce sufficient evidence of damages was not clearly erroneous. Although the plaintiff did introduce some evidence of its damages, we agree with the court's assessment that such evidence was founded on mere speculation.[10] Speculative evidence is not sufficient evidence for the trier to make a fair and reasonable estimate of the plaintiff's damages. See *Bronson & Townsend Co.* v. *Battistoni*, supra, 167 Conn. 326–27. Accordingly, the plaintiff's second claim must fail.

### III

The plaintiff's final claim is that the court incorrectly concluded that the defendant was not liable for compensation claimed by the plaintiff for the extra costs incurred by one of its subcontractors, Coppola Construction Company, Inc. (Coppola). At trial, the plaintiff alleged that Coppola had incurred these costs due to delays caused by the defendants. Because we conclude that the plaintiff lacked standing to bring that claim directly, we decline to address its merits.[11]

[10] The plaintiff introduced as evidence of damages various letters it sent to the defendant requesting additional compensation for these extra costs. These letters were written by William Coons, vice president and owner of the plaintiff. As the plaintiff contends, the letters indicate how each request was arrived at, i.e., 170LF x $42 = $7140, however, nothing in the letters indicates how each individual term was reached. Furthermore, as to the plaintiff's claim regarding items one, six, seven and eight, Coons testified that he "just listed what [he] thought was a fair number."

[11] Appellate courts may conduct an independent review of the question of standing. See, e.g., *Grabowski* v. *Bristol*, 64 Conn. App. 448, 450, 780 A.2d 953 (2001) ("Appellate courts, as well as trial courts, must examine an issue implicating subject matter jurisdiction. The question of standing may be raised by any of the parties, or by the court, sua sponte, at any time during judicial proceedings.").

"It is a fundamental concept of judicial administration that no person is entitled to set the machinery of the courts into operation unless [it is] for the purpose of obtaining redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or representative capacity. . . . A plaintiff can recover only by proving that he himself is entitled to prevail on the cause of action alleged. It is not enough that he prove that some other person, not a party to the case, would be entitled to recover on that cause of action." (Citations omitted; internal quotation marks omitted.) *Wexler Construction Co.* v. *Housing Authority*, 149 Conn. 602, 605, 183 A.2d 262 (1962).

Our careful examination of the record reveals, however, that the plaintiff has neither been injured nor threatened with injury due to the alleged nonpayment to Coppola because it has not paid Coppola's extra costs, nor has Coppola instituted or threatened to institute an action against the plaintiff to recover such costs. Thus, the plaintiff has failed to bring itself within "any exception to the usual rule denying a right of recovery to a plaintiff who has neither suffered nor been threatened with injury." Id., 607. We therefore conclude that the plaintiff lacked standing to bring the underlying claim. "Where a plaintiff lacks standing to sue, the court is without subject matter jurisdiction." (Internal quotation marks omitted.) *Ardito* v. *Olinger*, 65 Conn. App. 295, 300, 782 A.2d 698, cert. denied, 258 Conn. 942, 786 A.2d 429 (2001). In view of the court's absence of jurisdiction, the plaintiff's final claim is dismissed.

The judgment is affirmed.

In this opinion the other judges concurred.