AMERICAN DIAMOND EXCHANGE, INC. *v.*
SCOTT ALPERT ET AL.
(SC 18666)
(SC 18668)

Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued February 15—officially released October 18, 2011

*Steven D. Ecker*, for the appellant (defendant Jurgita Karobkaite).

*William F. Gallagher*, with whom, on the brief, were *David Babbitz* and *Hugh D. Hughes*, for the appellee (plaintiff).

*Opinion*

PALMER, J. The defendant Jurgita Karobkaite[1] appeals[2] from the judgment of the trial court, following a remand from the Appellate Court; see *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007); for a recalculation of damages based on the existing record. On remand, the trial court awarded $103,355.68 in damages to the plaintiff, American Diamond Exchange, Inc., for tortious interference with its business expectancy and for civil conspiracy. On appeal, the defendant claims, inter alia, that the evidence adduced at trial was insufficient to establish the plaintiff's damages with reasonable certainty. We agree with the defendant's claim of evidentiary insufficiency[3]

---

[1] The named defendant, Scott Alpert, was defaulted for failure to plead. He is not a party to this appeal. In the interest of simplicity, we refer to the defendant Jurgita Karobkaite as the defendant throughout this opinion.

[2] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The defendant also claims that (1) the damages award was legally improper because it was predicated on a cold record in violation of her right to have the fact finder make credibility determinations on the basis of the live testimony of the witnesses, and (2) the trial court misconstrued the remand order of the Appellate Court as requiring an award of damages, thereby shifting the burden of proof to the defendant on the issue of damages.

and, accordingly, reverse the judgment of the trial court.[4]

The following facts and procedural history are set forth in the opinion of the Appellate Court. "The defendant came to the United States in 1996, when she was twenty years old. She married [the named defendant, Scott] Alpert[5] in September of the following year. Approximately one month later, Alpert was hired as a retail sales clerk for the plaintiff, a corporation [located in the city of New Haven] that buys and sells diamonds and other jewelry . . . . [The plaintiff employs upwards of fifteen employees, depending on the time of year, and enjoys annual revenues in the millions of dollars.] Within the first few months of his employment, Alpert became an estate buyer for the plaintiff. [By 2002, he was generating annual gross sales of nearly $1 million.]

"Alpert testified [at trial] that throughout his employment, he diverted the plaintiff's customers so that he personally could purchase their jewelry. Alpert would tell the customers that [the plaintiff] was not interested in the piece that they were selling but that he would like to buy it for the defendant's upcoming birthday or anniversary. Alpert also testified that he diverted customers who had signed consignment agreements with the plaintiff. He would tell those customers that their piece was not moving as quickly as he had hoped but that he personally was willing to purchase it for the defendant. He would typically set up an off-premises

In view of our conclusion that the evidence was insufficient to support a damages award, we do not address these claims.

[4] We reverse the trial court's judgment in Docket No. SC 18666. The parties also reserved a question of law for advice in Docket No. SC 18668. As we explain in footnote 10 of this opinion, our reversal in Docket No. SC 18666 renders our advice with respect to that question of law unnecessary, and, therefore, we dismiss the appeal in Docket No. SC 18668.

[5] See footnote 1 of this opinion.

meeting to complete the transaction. Alpert would then resell the jewelry at the wholesale level, often in New York City or in other locations by mail or courier service. His selling price for an item usually was 45 to 50 percent higher than what he paid for its purchase. Alpert also admitted to stealing several diamonds from the plaintiff.

"Alpert testified that the defendant was fully aware of his diversion scheme from its inception and was a willing participant who shared in the profits. Bank records revealed that the defendant maintained a joint checking account with Alpert throughout the years in question. Checks were drawn on this account to pay for the purchase of jewelry from diverted customers, and deposits were made into this account when those items were resold. [At trial] Alpert provided several examples of such transactions, and copies of the corresponding check or deposit slip were admitted into evidence. Several of those deposits were for large sums, including a bank check made out to the defendant in the amount of $28,000 from Rich Schatz, Inc., a wholesale buyer to [which] Alpert had sold diamonds.

"The defendant was present when Alpert made transactions with diverted customers on numerous occasions, her signature is on some of the checks used to purchase the jewelry, and she endorsed checks from the wholesale purchasers. The defendant also sold a diamond to Nagi Jewelers for which she received a check payable to herself in the amount of $828, which she cashed.

"In . . . 2000, approximately $195,000 was deposited into the [defendant] and Alpert's joint account. The defendant also maintained a savings account, into which approximately $136,000 was deposited. During this time, the defendant never earned more than $500 a week, and Alpert's salary was never greater than

$96,000 a year. No additional income was listed on their joint tax returns for any of the years involved.

"Approximately one year prior to the termination of his employment, Alpert missed a meeting [that] he had arranged with a diverted customer, and the customer called the plaintiff's store looking for him. Alpert was confronted by David Schnee, the president of the plaintiff. Alpert promised Schnee that he would not conduct any business outside the store. At about this time, Alpert admitted to the defendant that he was addicted to crack cocaine. Shortly thereafter, Alpert moved out of the condominium that he owned with the defendant. Despite their separation, the deposits to and withdrawals from the [couple's] joint checking account continued.

"Approximately one year later, in April, 2002, Schnee hired a private investigator to set up a sting operation [designed to] catch Alpert purchasing jewelry from a diverted customer. Following the successful operation, Alpert confessed all the details of his scheme to Schnee, who terminated his employment immediately. The defendant and Alpert were subsequently divorced in . . . 2003.

"The plaintiff brought [an action] against the defendant and Alpert in a six count complaint, alleging as to both of them tortious interference with a business relationship or expectancy, violations of [the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.], and civil conspiracy. [The case was tried to the court.] At trial, Alpert testified . . . as to the veracity of all of the allegations in the complaint. The defendant, however, maintained throughout the trial that she did not know anything about Alpert's activities. [In its posttrial brief, the plaintiff requested damages in the amount of $240,000, which, according to the plaintiff, represented lost profits from the diverted

jewelry sales that Alpert and the defendant had shared.] A judgment of default was entered against Alpert on all counts. The court found the defendant liable for tortious interference with a business relationship or expectancy and civil conspiracy but found that she had not violated CUTPA. The court awarded the plaintiff $118,000 in damages." *American Diamond Exchange, Inc.* v. *Alpert,* supra, 101 Conn. App. 86–88.

"In its memorandum of decision, the [trial] court explained its award of damages as follows: 'It is difficult to calculate the amount of damages sustained by the plaintiff. There were theories running from $100,000 or so to nearer to $400,000. The most reasonable calculation, however, is $118,000, representing [the defendant's] "profit" by reflecting the difference between $334,000 in deposits in the defendant's bank account and $216,000 in debits to that account over the years in question.' " Id., 103.

The defendant appealed to the Appellate Court from the judgment of the trial court, claiming, inter alia, that the trial court's damages award was legally improper and not supported by the evidence.[6] See id., 85. The Appellate Court agreed with the defendant's claim, concluding that the damages award was contrary to law because it was based on the defendant's profit from the diverted transactions rather than on the plaintiff's losses. Id., 103. The Appellate Court further concluded that, because the trial court had found that the defendant did not become involved in Alpert's scheme until

---

[6] The defendant also claimed that the trial court improperly concluded that the plaintiff had proven all of the elements of its civil conspiracy and tortious interference with business expectancy claims, and that the court had applied an improper burden of proof with respect to the tortious interference claim. *American Diamond Exchange, Inc.* v. *Alpert,* supra, 101 Conn. App. 85. The Appellate Court rejected these claims; see id., 88, 99, 104–105; and the defendant has not challenged those aspects of the Appellate Court's decision in her appeal to this court.

April, 2001, it improperly had included in its calculation of damages diverted transactions that took place between 1998 and April, 2001. Id., 104. With respect to its judgment and remand order, the Appellate Court stated: "We . . . reverse the judgment of the trial court as to damages only and remand the case for a recalculation of damages on the basis of the plaintiff's lost profits, rather than improper gains to the defendant, and dating only as far back as April, 2001. On remand, the [trial] court is limited to consideration of the evidence in the existing record. In its calculation, the court may consider the net profit made by Alpert, as measured by the difference between the amount he earned on the resale of a given item of jewelry and the amount he had paid to acquire that item. The court, however, must also factor into its damages equation that the net profit to Alpert may have been substantially less than it would have been to the plaintiff because of the different price markup each applied."[7] Id.

[7] After the Appellate Court issued its decision, the defendant filed a petition for certification to appeal to this court, claiming, inter alia, that the Appellate Court improperly had limited the remand to a recalculation of damages based on the existing record. In her petition, which the plaintiff opposed, the defendant characterized the remand as "unfair" and "unworkable," and contended that the trial court's legal error entitled her to a new trial on damages, at which the plaintiff would be required to prove its damages under the correct legal standard. This court denied the defendant's petition; *American Diamond Exchange, Inc.* v. *Alpert*, 284 Conn. 901, 931 A.2d 261 (2007); and, therefore, we did not address the merits of the plaintiff's claim. We note, however, that, ordinarily, the Appellate Court's reversal of the judgment of the trial court due to the trial court's use of an improper legal standard in determining damages would require a new trial, not just a recalculation of damages based on the existing record. During oral argument before the Appellate Court, however, the plaintiff's appellate counsel asserted that, if that court were to conclude that the trial court had used an improper legal standard in awarding damages, the trial court, on remand, should recalculate damages based on the existing record. It appears that the Appellate Court was persuaded by that argument in limiting the remand as it did. See *American Diamond Exchange, Inc.* v. *Alpert*, supra, 101 Conn. App. 104. On appeal to this court, however, neither the plaintiff nor the defendant has raised a claim of error with respect to that remand, and, accordingly, the propriety of the remand is not before us.

Shortly after the Appellate Court issued its opinion, Judge William B. Lewis, who had presided over the trial of the case, passed away. The case subsequently was reassigned to Judge David R. Tobin, who directed the parties to file briefs setting forth their respective calculations of damages in light of the Appellate Court's remand.[8] In her brief, the defendant argued that damages could not be awarded to the plaintiff based on the existing record because the plaintiff had failed to introduce any evidence at trial to establish its losses. The defendant contended that the plaintiff, "a sophisticated business" with ample means at its disposal, "had its chance to prove its case at trial and, for whatever reason, failed to generate or present sufficient evidence to calculate lost profits with anything like the 'reasonable certainty' required by Connecticut law." Indeed, the defendant asserted that the record did not contain "a single business record, tax return, before and after revenue comparison, financial analysis, or any other documentary evidence of any kind from [the] plaintiff's business—*not a single scrap of paper*. There is *no* expert testimony to provide any substantive or methodological assistance whatsoever. Nor did [the] plaintiff offer any transaction-by-transaction, item-by-item or other kind of analysis or calculation tied to the particular facts of this case. Nothing." (Emphasis in original.)

The defendant further contended that, in order to calculate damages as directed by the remand order, which, as we have indicated, instructs the trial court to "consider the net profit made by Alpert, as measured by the difference between the amount he earned on the resale of a given item of jewelry and the amount he had paid to acquire that item"; *American Diamond Exchange, Inc.* v. *Alpert,* supra, 101 Conn. App. 104;

---

[8] There is no indication in the record that either party sought reconsideration of the remand order of the Appellate Court requiring the recalculation of damages based on the existing record in light of the death of Judge Lewis.

Judge Tobin would have to engage in "wild conjecture and guess work" because Alpert typically was unable to recall the acquisition and sale price of any of the diverted jewelry pieces, or even what type of jewelry was involved in a given transaction. Rather, the defendant maintained, Alpert's testimony concerning damages consisted of his review of his bank statements from the years corresponding to the diversion scheme and his identification of deposits and withdrawals that he believed were related to the diverted jewelry sales.

The defendant finally contended, in the alternative, that, even if there was sufficient evidence to establish the plaintiff's losses with reasonable certainty, Judge Lewis had not made any factual findings that would enable Judge Tobin to calculate them on remand from the Appellate Court. The defendant asserted that the only evidence relevant to a determination of the plaintiff's lost profits was the "uncorroborated, self-serving, [and] conclusory" testimony of the plaintiff's president, Schnee, who had testified that the plaintiff enjoyed an average markup of 100 percent on consignment and estate jewelry sales. The defendant also observed that Judge Lewis did not rely on Schnee's testimony in his memorandum of decision and he otherwise made no determination as to Schnee's credibility. The defendant further noted that Judge Lewis did not credit Alpert's testimony regarding his average markup. To the contrary, Judge Lewis expressly stated in his memorandum of decision that Alpert was "an admitted thief, drug addict, gambler and liar [who] has absolutely no credibility." The defendant maintained, therefore, that, in order to comply with the remand order, Judge Tobin would not only have to ignore Judge Lewis' express finding that Alpert was not a credible witness, he would be required to make credibility determinations on the basis of a cold record in violation of the defendant's due process right to a factual determination by a fact

finder who had observed the trial testimony of the various witnesses.

The plaintiff asserted that the evidence was sufficient to calculate its lost profits on the basis of "the credible testimony of . . . Schnee . . . as to the profit margins and general profitability of the type of business [that was] diverted, and the [bank] records and testimony [of Alpert] documenting the acquisition costs and or wholesale . . . values of the diverted items." The plaintiff further maintained that, if, as the defendant claimed, the evidence had been insufficient to calculate the plaintiff's lost profits, the Appellate Court would not have remanded the case for a recalculation of damages based on the existing record but, rather, would have remanded for a new trial. The plaintiff asserted, therefore, that it must be presumed that the Appellate Court, in fashioning the remand that it did, implicitly had concluded that the evidence was sufficient to calculate the plaintiff's losses.

Thereafter, Judge Tobin issued a memorandum of decision in which he found that "[t]he only evidentiary basis for determining the plaintiff's lost profits is the testimony of . . . Schnee . . . that the plaintiff enjoyed an average markup of 100 percent on jewelry [that] it resold after acquiring it from individual sellers." Judge Tobin then noted that "[t]he defendant has objected to the court's consideration of Schnee's testimony, correctly pointing out that the trial court made no findings with respect to the plaintiff's markup or with respect to Schnee's credibility. The [defendant] also points out that the record contained evidence that the [plaintiff's] markup on jewelry varied depending on the value of particular items. However, the defendant does not point to any other evidence in the record from which the court could find the amount of lost profits [that] the plaintiff suffered as a result of the transactions occurring after April 1, 2001. Moreover, the court must

keep in mind the explicit directions of the Appellate Court [that the court on remand] must . . . factor into its damages equation that the net profit to Alpert may have been substantially less than it would have been to the plaintiff because of the different price markup each applied. . . . In the context of this case and the evidence presented, the above quoted language strongly suggests that the Appellate Court expected [the] court to consider Schnee's testimony regarding the markup [that] the plaintiff enjoyed."[9] (Citation omitted; internal quotation marks omitted.)

Next, for purposes of calculating the plaintiff's damages, Judge Tobin added all of the deposits into the defendant's and Alpert's joint and personal bank accounts between April 1, 2001, and April 12, 2002, that, according to Alpert's trial testimony, were related to diverted transactions. The total of those deposits came to $152,449.63. Judge Tobin then noted that Alpert had testified that his average markup on diverted sales was 45 to 50 percent. Using the midpoint between those two figures, 47.5 percent, Judge Tobin found that $152,449.63 in diverted sales yielded a total cost to Alpert of $103,355.68. Because Schnee testified that the plaintiff enjoyed a 100 percent markup on resold jewelry, Judge Tobin concluded that the plaintiff's lost prof-

[9] We note that, prior to issuing his memorandum of decision, Judge Tobin conducted a hearing at which the parties presented arguments. At that time, Judge Tobin expressed his frustration with the task of calculating damages in light of the paucity of evidence on that element of the plaintiff's claims, stating: "Well, again, I'm operating under a remand with some instructions, and I hope you can both agree with me that it would have been far better [if] the Appellate Court—if this is such an easy task—if [the Appellate Court] had simply done it [itself] rather than put [this court] in the position of— frankly, it feels like trying to punch my way out of a paper bag or something, where . . . there's no—the substance of this case is quite elusive, to say the least." Although it appears that Judge Tobin may have believed that he was bound to award damages under the Appellate Court's remand order, for the reasons set forth hereinafter, we disagree with that interpretation of the Appellate Court's remand order.

its on the diverted sales were equal to the defendant's acquisition cost of $103,355.68, which he awarded to the plaintiff in damages.[10] This appeal followed.

On appeal, the defendant renews the claims that she raised in the trial court on remand, including her claim that the plaintiff failed to present sufficient evidence from which its lost profits could be determined with reasonable certainty. The defendant contends that the insufficiency of the evidence is the direct result of the plaintiff's theory of damages, that is, one that focuses exclusively on the defendant's alleged profits from the diverted transactions rather than on the plaintiff's lost profits.

---

[10] After Judge Tobin rendered judgment for the plaintiff, the defendant filed a motion to open and set aside that judgment on the ground that it had been obtained by fraud, namely, the perjured testimony of Alpert, the only witness to implicate the defendant directly in the tortious activities underlying the action. The defendant's motion was based on Alpert's voluntary testimony at an examination under oath that his trial testimony implicating the defendant in his scheme to defraud the plaintiff had been false and perjurious. The plaintiff filed an objection to the motion, arguing that Alpert's recantation did not affect the validity of the judgment because the trial court did not base its findings as to the defendant's liability solely on Alpert's testimony. The parties subsequently agreed that the materiality of Alpert's trial testimony to the judgment was critical to the success of the defendant's motion to open and set aside the judgment and, pursuant to General Statutes § 52-235 and Practice Book § 73-1, filed a joint motion for reservation of a question of law to the Appellate Court, accompanied by a stipulation of facts, which the trial court, *Mintz, J.*, granted. The question proposed for reservation is: "Upon the facts as found by . . . [Judge Lewis] and affirmed by [the Appellate Court] on appeal . . . [*American Diamond Exchange, Inc.* v. *Alpert*, supra, 101 Conn. App. 83]—as supplemented by the stipulation of facts herein . . . is it correct to conclude, as a matter of law, that [the defendant's] motion to open and set aside/vacate judgment . . . must be denied because the judgment against [the defendant] does not depend in any material respect [on] the truthfulness of . . . Alpert's testimony at trial?" Subsequently, the defendant was designated as the appellant in the reserved appeal, which was consolidated by the Appellate Court with the defendant's appeal from the underlying judgment, and both appeals were transferred to this court. Because of our conclusion that the evidence was insufficient to support an award of damages in the underlying action and, therefore, that the judgment against the defendant must be reversed, our advice with respect to the question reserved is unnecessary.

The plaintiff counters that the defendant waived her evidentiary insufficiency claim by failing to raise it in her direct appeal from the judgment of the trial court, *Lewis, J.*, or, alternatively, that she is barred from raising it in this appeal because the Appellate Court decided the claim against her in the first appeal. In support of the latter contention, the plaintiff argues, as it did in the trial court, that, because the Appellate Court remanded the case for a recalculation of damages based on the existing record, we must assume that that court implicitly concluded that the evidence was sufficient to support an award of damages using the correct measure of damages. The plaintiff further contends that, even if the defendant is not barred from challenging the sufficiency of the evidence in the present appeal, she cannot prevail on that claim because the evidence presented at trial was sufficient to establish its losses with reasonable certainty. We conclude that the defendant is not precluded from challenging the sufficiency of the evidence and, further, that the evidence was insufficient to support an award of damages.

We first address the plaintiff's contention that the defendant waived her right to challenge the sufficiency of the evidence because the defendant was required but failed to raise that claim in her appeal from the judgment of the trial court, *Lewis, J.* In support of this contention, the plaintiff relies on *Detar* v. *Coast Venture XXVX, Inc.*, 91 Conn. App. 263, 266, 880 A.2d 180 (2005), in which the Appellate Court declined to review a claim that the trial court improperly had awarded prejudgment interest because that award had been part of the original judgment and, therefore, could have been challenged in the first appeal. In reaching its determination, the Appellate Court relied on the oft cited principle that, "when a party brings a subsequent appeal, it cannot raise questions [that] were or could have been answered in its former appeals." Id.; see also id. ("[f]ailure to raise

an issue in an initial appeal . . . constitutes a waiver of the right to bring the claim [in a subsequent appeal]"). It is axiomatic, however, that this principle applies only when the issue that a party seeks to raise in a subsequent appeal was one that the party actually litigated *prior to the initial appeal* such that the issue *could have been raised in the initial appeal.*

As we previously indicated, in the original trial of this case, the plaintiff did not claim lost profits as part of its damages but, instead, requested an award of damages based on the *defendant and Alpert's* alleged profits, as measured by total deposits in their bank accounts less total withdrawals during the period corresponding to the diversion scheme.[11] Judge Lewis granted this request and, in his memorandum of decision, made no factual findings relating to the plaintiff's lost profits. Indeed, Judge Lewis made no mention whatsoever of lost profits as an alternative measure of damages. As a consequence, the defendant was under no obligation in the first appeal to challenge the sufficiency of the evidence with respect to that issue. Indeed, as the defendant notes, because the issue never was adjudicated in the trial court, the record was not adequate for review, and, therefore, it would have been futile for her to have raised the issue in the first appeal. See, e.g., *Remillard v. Remillard,* 297 Conn. 345, 351, 999 A.2d 713 (2010) ("[b]ecause our review is limited to matters in the record, we . . . will not address issues not decided by the trial court" [internal quotation marks omitted]); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). Accordingly, we reject the plaintiff's contention that the defen-

---

[11] Specifically, in its posttrial brief, the plaintiff claimed damages in the amount of $240,000, which, according to the plaintiff, represented "Alpert's . . . estimate of the profit [that Alpert and the defendant] made through the diversion of [the] plaintiff's business . . . ."

dant has waived the right to challenge the sufficiency of the evidence with respect to the plaintiff's lost profits.

We also are unpersuaded by the plaintiff's apparent contention that the defendant is precluded from challenging the sufficiency of the evidence with respect to the plaintiff's lost profits because the Appellate Court decided that claim against her in the first appeal. The short answer to this argument is that, even if the Appellate Court *did* decide the defendant's claim in the first appeal, "[d]ecisions of the Appellate Court are not binding on this court . . . ." *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 652, 6 A.3d 60 (2010). Rather, "[t]his court follows the well-recognized principle of law that the opinion of an appellate court, so far as it is applicable, establishes the law of the case upon a retrial, and is equally obligatory [on] the parties to the action and [on] the trial court. . . . The rule is that a determination once made will be treated as correct throughout all subsequent stages of the proceeding *except when the question comes before a higher court* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Daniels*, 209 Conn. 225, 237, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). Moreover, we are not persuaded that the Appellate Court made a determination that the plaintiff's evidence necessarily was sufficient to establish damages under the proper legal theory. We reach this conclusion, first, because the Appellate Court's opinion contains no clear indication that it had made such a determination and, second, because, as we discuss hereinafter, it is apparent from a review of the evidence adduced at trial that it is manifestly insufficient to prove damages. Accordingly, the plaintiff's contention that the defendant is precluded from raising a claim of evidentiary insufficiency because that issue was decided against her in the first

appeal is without merit. We turn, therefore, to that claim.

The following principles guide our analysis. "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 27, 761 A.2d 1268 (2000). "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss; see *Riccio* v. *Abate*, 176 Conn. 415, 418–19, 407 A.2d 1005 (1979); it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 33.

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689, 697 A.2d 1137 (1997). We also note that there are circumstances in which "proof of damages may be difficult and that such difficulty is, in itself, an insufficient reason for refusing an award once the right to damages has been established. . . . Nevertheless, the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do

require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate." (Citations omitted; internal quotation marks omitted.) *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 226 n.22, 477 A.2d 988 (1984); see also *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998) ("[i]n order to recover lost profits . . . the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty"); *Simone Corp.* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982) ("[d]amages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty" [internal quotation marks omitted]). "Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." *Viejas Band of Kumeyaay Indians* v. *Lorinsky,* 116 Conn. App. 144, 163, 976 A.2d 723 (2009).

Applying these principles to the present case, we conclude that it is readily apparent that the evidence presented at trial was wholly inadequate to establish the plaintiff's lost profits with reasonable certainty. Indeed, as Judge Lewis observed, the only evidence remotely relevant to such a determination was the uncorroborated testimony of the plaintiff's president, Schnee, who stated that the plaintiff's markup on estate jewelry sales was, at a "[m]inimum," 100 percent "[e]very time" on items that cost less than $50,000 to acquire. No documentary evidence was offered to support this claim, however, "nor was there any testimony to the effect that such data were not available." *Doeltz* v. *Longshore, Inc.*, 126 Conn. 597, 601, 13 A.2d 505

(1940); see also id., 601–602 (documentary or other reliable evidence required to corroborate amount of lost profits). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik* v. *First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); see also *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 225–28 (plaintiff's uncorroborated testimony regarding damages insufficient to establish losses with reasonable certainty); *Bianco* v. *Floatex, Inc.*, 145 Conn. 523, 525, 144 A.2d 310 (1958) ("the mere statement of the plaintiff that the reasonable value of his [services] . . . was $2250 was an inadequate basis for the court's finding that the reasonable value was $1450 or, for that matter, any other amount").

"While the modern tendency is toward greater liberality in the requirements . . . [for proving lost profits] *it is the unvarying rule that evidence of such certainty as the nature of the case permits should be produced.*" (Citation omitted; emphasis added.) *Doeltz* v. *Longshore, Inc.*, supra, 126 Conn. 601. We can only conclude that the plaintiff, a sophisticated business that, according to its president, spends between $250,000 and $600,000 annually on billboard advertising alone, was in a position to produce objective, nonspeculative, documentary proof of its profit margins, such as, for example, accounting data of its historical earnings, or some other evidence documenting its profit margins on comparable consignment or estate jewelry pieces. The plaintiff's failure to produce such evidence, which we must assume was readily available to the plaintiff, requires us to conclude that it has not met its burden of establishing its losses with reasonable certainty. See *CAS Construction Co.* v. *East Hartford*, 82 Conn. App. 543, 556–57, 845 A.2d 466 (2004) (evidence insufficient to support damages award when "plaintiff [construction

company] did not offer any documented proof [of damages], but [instead] relied on its subjective and speculative opinion as to [such losses]" [internal quotation marks omitted]). Although it is true, as the plaintiff contends, that difficulty in assessing damages is not a reason for declining to award them once a defendant's liability has been established, it is equally true that the plaintiff bears the burden of producing evidence of sufficient quality to permit the fact finder to award damages without resort to conjecture or speculation. That standard was not met in the present case.

Indeed, the speculative nature of the evidence relating to damages in this case is abundantly clear. As the defendant contends, even if the evidence had permitted the fact finder to determine the plaintiff's profit margins with reasonable certainty, there still was no way to calculate what the plaintiff's profits would have been on the diverted sales with anything approaching reasonable certainty because, with very few exceptions, Alpert was unable to recall what he paid to acquire a piece of diverted jewelry or what he later sold it for. The plaintiff, moreover, made no efforts to obtain this information. Indeed, when Schnee was asked by counsel whether he had conducted an investigation to verify or quantify the plaintiff's losses, such as by contacting diverted clients or businesses that had purchased diverted merchandise from Alpert, he responded, "It's a waste of time. It's a waste of money. . . . I want to move on." Later, when Schnee was asked whether he had "a calculation of the losses sustained by [the plaintiff] as a result of . . . Alpert's activity," and whether he was "asking on behalf of [the plaintiff] that damages be awarded for sales that were diverted," he responded: "I'm asking this court, [that is] Judge Lewis, to look at the evidence that has been submitted and to make a decision; whatever he decides I'm going with." In light of the foregoing, it is clear that "[t]his is a case in which we reverse the

judgment not for lack of 'mathematical exactitude' [with respect to the plaintiff's damages] . . . but because the plaintiff failed to provide [*any reliable proof* of its damages]. This outcome is a direct result of the plaintiff's choice of evidence." (Citation omitted; emphasis added.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 78.

The judgment in Docket No. SC 18666 is reversed and the case is remanded with direction to render judgment for the defendant; the appeal in Docket No. SC 18668 is dismissed.

In this opinion the other justices concurred.