******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

DORRANCE T. KELLY *v.* MARSHALL D.
KURTZ ET AL.
(AC 41366)
(AC 41365)

Keller, Moll and Devlin, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendants for, inter alia, breach of contract relating to the buyout of the plaintiff's oral surgery practice by the defendant K. In connection therewith, the parties executed three documents, including a purchase and sale agreement, an operating agreement and a supplementary agreement. Pursuant to those agreements, K paid the plaintiff two installments and subsequently became the manager of the practice. Pursuant to the supplementary agreement, the plaintiff could work a part-time schedule of his choosing and retire at the time of his choosing, provided that he retired by the age of eighty. The relationship between the plaintiff and K became strained, and K hired a new associate without the consent of the plaintiff and told the plaintiff he wanted him to retire in six weeks. Approximately one month after K paid the final installment due under the purchase and sale agreement, he had the locks on the doors of the practice changed. The plaintiff, believing he had been terminated, began seeing patients in other towns. The defendants ordered a street sign for the practice that included the plaintiff's name and kept the plaintiff's name on the practice's website and referral cards for approximately six months after the plaintiff left the practice. The plaintiff filed a nineteen count revised complaint in which he alleged claims for, inter alia, breach of contract pertaining to all three agreements, breach of the implied covenant of good faith and fair dealing relating to all three agreements, invasion of privacy, tortious interference with business expectancies, violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.), and unjust enrichment. The defendants filed an eleven count counterclaim, alleging, inter alia, that the plaintiff had breached the operating agreement and the lease agreement between the plaintiff and the practice. After the jury returned a verdict in favor of the plaintiff on nine of his ten claims against the defendants and found in favor of the defendants on the remaining counts of the counterclaim, the defendants filed a motion to set aside the verdict and to dismiss the plaintiff's claims of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in that agreement. The trial court denied in part and granted in part the defendants' motion to set aside, granted their motion to dismiss and rendered judgment in favor of the plaintiff. On the separate appeals to this court by the plaintiff and the defendants, *held:*

1. The trial court did not abuse its discretion in denying the defendants' motion to set aside the jury's verdict on the counts alleging breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing:

a. The defendants' claim that the evidence was insufficient to support the jury's finding of a breach of the supplementary agreement because the evidence was insufficient to prove that the plaintiff was terminated or that he was prevented from working a schedule of his choosing was unavailing: the trial court, in rejecting the defendants' claim, determined that the jury reasonably could have found on the basis of the evidence presented that the defendants terminated the plaintiff or prevented him from working a schedule of his choosing, and that notwithstanding the lack of a formal, express statement of termination, the jury reasonably could have found that certain of the defendants' conduct constituted a breach of their obligations to continue to employ the plaintiff and prevented him from receiving the benefits he was entitled to under the agreement; moreover, the court properly declined the defendants' invitation to revisit the evidence at trial and to substitute its judgment for that of the jury, and there was ample evidence introduced at trial on which the jury could have based a finding that the plaintiff was denied

the right to work a schedule of his choosing.

b. The defendants could not prevail on their claim that the verdict was inconsistent because the jury awarded $2,000,000 for breach of the supplementary agreement and $150,000 for breach of the implied covenant of good faith and fair dealing in that agreement, when both claims were based on identical evidence; the trial court found that even though the plaintiff based both causes of action on similar factual allegations, the plaintiff pleaded two separate causes of action and could recover two different jury awards, and, thus, that the jury could have found, as a matter of law, that the plaintiff suffered two separate legal harms from the same facts, as the jury's finding of breach of contract did not require a finding of any improper motive by the defendants and did not necessarily include damages arising from ill intent, and, therefore, the court properly fulfilled its duty to harmonize the jury's verdict.

2. The trial court did not abuse its discretion in setting aside the jury's verdict on the plaintiff's claim that the defendants invaded his privacy by misappropriating his name after he was terminated; even if the defendants' use of the plaintiff's name was wrongful, the plaintiff failed to prove that he suffered any damages as a result of the defendants' use of his name, and the plaintiff presented no evidence of the commercial benefit to the defendants from the use of his name.

3. The trial court did not abuse its discretion in setting aside the jury's verdict and award of damages on the plaintiff's claim of tortious interference with his business expectancies; the plaintiff failed to prove that he suffered an actual loss as a result of the defendants' alleged interference with his business expectancies, and because the plaintiff already had recovered for losses he sustained as a result of his wrongful termination, the trial court properly ensured that he did not recover twice for the same loss.

4. The trial court did not abuse its discretion in setting aside the jury's verdict on the plaintiff's CUTPA claim, the plaintiff having failed to prove that he suffered any ascertainable loss as a result of the alleged CUTPA violations.

5. The trial court properly set aside the jury's verdict on the plaintiff's claim of unjust enrichment; the plaintiff had already recovered for wrongful termination under his claim that the defendants breached the supplementary agreement and, therefore, could not recover again under an unjust enrichment theory.

6. The trial court properly dismissed the plaintiff's claims of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in that agreement, as the plaintiff lacked standing to bring those claims; the loss that the plaintiff alleged was derivate of a loss to the medical practice, and he failed to prove that he was specifically and injuriously affected by K's failure to secure his approval of the hiring of the new associate.

Argued May 23—officially released October 15, 2019

*Procedural History*

Action for, inter alia, breach of contract relating to the sale of the plaintiff's oral surgery practice to the named defendant, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the defendants filed a counterclaim; subsequently, the plaintiff withdrew four counts of the complaint and the defendants withdrew counts one through seven of their counterclaim; thereafter, the matter was tried to the jury before *Truglia, J.*; verdict in part for the plaintiff on the complaint and for the defendants on their counterclaim; subsequently, the trial court granted the defendants' motion to dismiss the plaintiff's claims of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in the operating agreement, and granted in part the defendants' motion to set aside the verdict for the plaintiff and rendered judgment on the complaint thereon, from which the

plaintiff and the defendants filed separate appeals with this court, which consolidated the appeals. *Affirmed.*

*Dana M. Hrelic*, with whom were *Wesley W. Horton* and, on the brief, *Robert Flynn*, for the appellants-appellees (defendants).

*Kara A. Lynch*, pro hac vice, with whom were *Nathan J. Buchock* and, on the brief, *Brian E. Spears*, for the appellee-appellant (plaintiff).

*Opinion*

DEVLIN, J. In this case arising from the buyout of an oral surgery practice, the plaintiff, Dorrance T. Kelly, DDS, and the defendants, Marshall D. Kurtz, DMD, Marshall D. Kurtz, DMD, PC, and Danbury Oral and Maxillofacial Surgery Associates, LLC (DOMSA), appeal from the judgment of the trial court rendered, following a jury trial, in favor of the plaintiff, in the amount of $2,150,000. To establish the terms of the buyout, the parties executed three documents: a purchase and sale agreement, an operating agreement, and a supplementary agreement.[1] On appeal, the defendants claim, in AC 41366, that the trial court erred in denying their motion to set aside the jury's verdict on the plaintiff's claims of breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing in the supplementary agreement on the grounds that (1) the evidence presented at trial was insufficient to sustain the jury's finding of breach of the supplementary agreement, and (2) the jury's awards of damages on the plaintiff's claims of breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing in the supplementary agreement were inconsistent. The plaintiff claims, in AC 41365, that the trial court erred in (1) granting the defendants' motion to set aside the jury's verdict on his claims of invasion of privacy by misappropriation of his name, tortious interference with his business expectancies, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statues § 42-110a et seq., and unjust enrichment; and (2) dismissing his claim of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in the operating agreement on the ground that he lacked standing to bring those claims. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our disposition of these appeals. The plaintiff and Kurtz are oral surgeons, who began practicing together in 2004. From May, 2004 to July, 2008, Kurtz worked as a salaried employee for the plaintiff, who had been practicing since the early 1970s and had built a successful practice. On or about July 1, 2006, Kurtz entered into a "Purchase and Sale Agreement of Personal Goodwill of Dorrance T. Kelly, DDS and Assets of Dorrance T. Kelly, DDS, Oral Surgery, P.C." The purchase and sale agreement provided that the plaintiff would sell his practice to Kurtz for $1,600,000, to be paid to the plaintiff in two equal installments; the first installment to be paid on July 17, 2006, and the second on June 30, 2009. The agreement further provided that the existing practice would continue to operate through a newly formed limited liability company known as DOMSA.

Also on July 1, 2006, the parties entered into an

"Amended and Restated Operating Agreement of Danbury Oral & Maxillofacial Surgery Associates, LLC" (operating agreement). The operating agreement, which was signed by Dorrance T. Kelly, DDS, Oral Surgery, P.C. and Marshall D. Kurtz, DMD, P.C., provided that each member professional corporation would hold a 50 percent ownership interest in DOMSA, with the plaintiff initially acting as the manager with full authority for day-to-day management and control of the practice. After Kurtz paid the second installment of the purchase price, Kurtz would become the manager of DOMSA and assume full authority for its management, control and direction. The operating agreement further provided: "In instances where a [m]ember is a [p]rofessional [c]orporation, a limited liability company, a [l]imited liability [m]embership or other entity, the term '[m]ember' shall include for all purposes all stockholders, members, [m]embers or other owners thereof, of whatever nature." It required that the hiring of additional staff, including associates, be made by an affirmative vote of all members. The operating agreement also provided that the plaintiff would retire on June 30, 2009, upon his receipt from Kurtz of the second installment of the purchase price of the practice, and that upon retirement, he "shall have the right to . . . continue [working] as an associate of [DOMSA] until the age of [eighty] at a rate of compensation of fifty [percent] (50%) of his net collections upon such other terms and conditions as the parties hereto shall agree." The operating agreement provided that "[t]he [m]anager shall direct, manage and control the business of [DOMSA] to the best of [his] ability. Except for situations in which the approval of the members is expressly required by this Operating Agreement or by nonwaivable provisions of applicable law, the [m]anager shall have the full and complete authority, power and discretion to manage and control the business, affairs and properties of [DOMSA], to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of [DOMSA's] business."

On June 30, 2009, the parties, individually, and as members of their respective professional corporations, entered into a "Supplementary Agreement," which modified certain provisions of the purchase and sale agreement and the operating agreement. The supplementary agreement modified the plaintiff's obligations with respect to working days and on call responsibilities, and provided that he would work a reduced part-time schedule of his choosing. It further modified the requirement that the plaintiff retire on June 30, 2009, and provided that he could retire at a time of his choosing, but maintained that he would retire and "discontinue the practice of dentistry" when he reached the age of eighty, and that the plaintiff would continue to own a one percent interest in DOMSA until Kurtz paid the full purchase price.

Over time, the plaintiff and Kurtz's relationship became strained. At some point in the latter part of 2009, the plaintiff threatened to leave DOMSA if Kurtz did not pay him 65 percent of his net collections. Kurtz acquiesced and agreed to pay the plaintiff the 65 percent that he demanded, but reverted to paying him 50 percent in December, 2012, in accordance with the operating agreement.

In late 2012, and continuing into early 2013, the Department of Social Services conducted an audit of DOMSA's Medicaid billing records and determined that DOMSA had received overpayments of approximately $212,000 for Medicaid patients who had been treated between 2008 and 2010. To reimburse the Department of Social Services for the overpayment received by DOMSA, Kurtz agreed, without informing the plaintiff, to continue to treat Medicaid patients without compensation until the full amount of the overpayment was satisfied. This agreement, however, did not affect the plaintiff, who continued to treat Medicaid patients and received 50 percent of the amount that he billed for his patients.

At some point prior to the summer of 2013, the plaintiff and Kurtz discussed hiring an associate. To that end, Kurtz, as the manager of DOMSA, placed an advertisement for that position and began speaking with applicants. Although the operating agreement expressly provided that "an affirmative vote of all [m]embers" was required for the "[h]iring of additional staff inclusive of [a]ssociates," Kurtz and the plaintiff did not discuss the hiring process as it progressed.

On August 1, 2013, the plaintiff and Kurtz had a meeting, which Kurtz secretly recorded, in the plaintiff's office. At that meeting, Kurtz told the plaintiff that he had hired a new associate, Daniel Traub, who would begin working at DOMSA on October 1, 2013. The plaintiff expressed his displeasure of Kurtz' hiring of Traub without the plaintiff's consent. Kurtz told the plaintiff that, by the time Traub started working in October, he would own 100 percent of DOMSA, and could manage it "as he saw fit." He told the plaintiff that he would have "the right to change anything that I want in the contracts . . . I can amend anything" and the right to "make the hours be whatever I want . . . make the staff do whatever I want, and the office space be whatever I want, and the office open and close." Kurtz told the plaintiff that he wanted him to retire before Traub commenced his employment at DOMSA, and suggested September 15, 2013, as his retirement date. The plaintiff told Kurtz that he did not want to retire and that he had the right to work at DOMSA for as long as he wished until he reached the age of eighty. Later that day, in an unrecorded conversation, Kurtz told the plaintiff that his last day would be September 17, 2013.

The plaintiff took a medical leave from DOMSA from August 2 to August 20, 2013. On August 15, 2013, Kurtz paid the final installment due under the purchase and sale agreement. When the plaintiff returned from medical leave on August 21, 2013, he instructed the staff not to schedule any new patients for him beyond September 12, 2013. On August 22, 2013, Kurtz's attorney, Steven Smart, informed the plaintiff's attorney, Kara Lynch, that the plaintiff had not been terminated or forced to retire, and that he could continue to work at DOMSA as an associate.

When the plaintiff arrived at the office on September 17, 2013, he was told that he had no patients on his schedule and that Kurtz would direct patients to him as he saw fit. The plaintiff left the office without seeing any patients that day.

The plaintiff arrived at the office the next day to find that the locks on the doors of the practice had been changed. He confronted Kurtz in the office parking lot, where they argued about the breakdown of their professional and personal relationship. Believing that he had been terminated by Kurtz, the plaintiff did not return to work at DOMSA after this argument.

On September 21, 2013, Lynch sent an e-mail to Smart indicating that the plaintiff had been terminated by Kurtz. Smart responded that the plaintiff had not been terminated or forced to retire, and that the plaintiff could continue to work at DOMSA and receive his previously agreed upon 50 percent of fees that he generated.

Believing that he had been terminated by Kurtz, the plaintiff began seeing patients in Norwalk and West Hartford. Despite the plaintiff's absence from DOMSA, Kurtz ordered a new street sign for DOMSA that included the plaintiff's name. Kurtz also did not remove the plaintiff's name from DOMSA's website or patient referral cards for approximately six months after he left the practice.

The plaintiff thereafter commenced this action, and by way of a nineteen count revised complaint, alleged the following: four counts of breach of contract (purchase and sale agreement, operating agreement and supplementary agreement); three counts of breach of the implied covenant of good faith and fair dealing; one count of successor liability; one count of violation of the Connecticut Fair Employment Practices Act (CFEPA), General Statutes § 46a-51 et seq.; one count of breach of fiduciary duty; one count of failure to pay wages to an employee in violation of General Statutes § 31-71b; one count of invasion of privacy by misappropriation of name; one count of tortious interference with business expectancies; one count of violation of CUTPA; one count of unjust enrichment; one count of slander; one count of intentional infliction of emotional distress; one

count of negligent infliction of emotional distress; and one count seeking a declaratory judgment that the plaintiff is no longer bound by the restrictive covenant contained in the operating agreement.

The defendants filed an answer, one special defense, and an eleven count counterclaim alleging, inter alia, that the plaintiff had breached the operating agreement and the lease agreement between the plaintiff, as the owner of the building in which the Danbury office of DOMSA is located, and DOMSA.

Following several days of trial, the court submitted to the jury interrogatories on ten distinct claims by the plaintiff against the defendants: breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in that agreement; breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing in that agreement; violation of CFEPA; breach of fiduciary duty; invasion of privacy by appropriation of name; tortious interference with business expectancies; violation of CUTPA; and unjust enrichment.[2] The court also submitted to the jury interrogatories on the defendants' claims for damages related to the plaintiff's alleged violation of the lease agreement: unjust enrichment; breach of the implied covenant of good faith and fair dealing in the lease agreement; and violation of CUTPA.[3] The jury returned a verdict in favor of the plaintiff on nine of his ten claims against the defendants, awarding him damages on seven of those ten claims, for a total award of $3,150,000 in compensatory damages.[4] The jury also found that the plaintiff was entitled to punitive damages on five of those seven claims. The jury found in favor of the defendants on the remaining counts of their counterclaim, awarding damages in the amount of $175,000.

The defendants thereafter filed a motion to set aside the jury's verdict on the complaint and a motion to dismiss the plaintiff's claims of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in that agreement. The trial court denied in part and granted in part the defendants' motion to set aside, and granted their motion to dismiss. The court rendered judgment in favor of the plaintiff in the amount of $2,150,000, and these appeals followed. Additional facts will be set forth as necessary.

Because the bulk of the claims raised in these appeals arises from the trial court's rulings on the defendants' motion to set aside the jury's verdict, we begin by setting forth the well settled standard of review governing the court's judgment on those claims. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence . . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside where the manifest

injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Kumah* v. *Brown*, 160 Conn. App. 798, 803, 126 A.3d 598, cert. denied, 320 Conn. 908, 128 A.3d 953 (2015). With these principles in mind, we address the parties' claims in turn.

## I
## AC 41366

We begin with the defendants' appeal challenging the jury's verdict in favor of the plaintiff and the trial court's denial of their motion to set aside the verdict. In response to the interrogatories submitted, the jury found that the defendants breached the supplementary agreement and breached the implied covenant of good faith and fair dealing in the supplementary agreement, by wrongfully terminating the plaintiff before he reached the age of eighty and by failing to allow the plaintiff to work a schedule of his choosing. The jury awarded the plaintiff $2,000,000 in compensatory damages for breach of the supplementary agreement, and $150,000 in compensatory damages for breach of the implied covenant of good faith and fair dealing in the supplementary agreement.[5] The trial court denied the defendants' motion to set aside these portions of the jury's verdict.

### A

The defendants first argue that the evidence was insufficient to support the jury's finding of breach of the supplementary agreement because the plaintiff was not terminated from his employment at DOMSA or prevented from working a schedule of his choosing. We are not persuaded.[6]

"[I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it. . . .

"We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation. . . . A motion to set aside the verdict should be granted if the

jury reasonably and legally could not have reached the determination that they did in fact reach." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003).

In the context of our "review of a motion to set aside the verdict . . . given the deference our standard of review requires to the trial court's decision, it is especially important to know what evidence before the jury justified the verdict in the court's mind." *Levine* v. *418 Meadow Street Associates, LLC*, 163 Conn. App. 701, 715, 137 A.3d 88 (2016). "[T]he trial court is uniquely situated to entertain a motion to set aside a verdict as against the weight of the evidence because, unlike an appellate court, the trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . Indeed, we have observed that, [i]n passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. . . . [T]he trial judge can gauge the tenor of the trial, as we, on the written record cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *State* v. *O'Donnell*, 174 Conn. App. 675, 696–97, 166 A.3d 646, cert. denied, 327 Conn. 956, 172 A.3d 205 (2017). "The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument for upholding the verdict." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 371, 119 A.3d 462 (2015).

In their motion to set aside the verdict, the defendants raised the same arguments to the trial court that they advance now—that the evidence was insufficient to prove that the plaintiff was terminated or that he was prevented from working a schedule of his own choosing. Following a thorough and well reasoned analysis of the evidence presented to the jury, and the law pertaining to its examination of the sufficiency of that evidence, the court rejected the defendants' arguments. Specifically, the court explained that "[t]he jury reasonably could have found that the defendants terminated [the plaintiff] and/or prevented him from working a schedule of his choosing based on the following evidence: (1) the August 1, 2013 recorded conversation, including Kurtz' request that [the plaintiff] leave by September 17, 2013, so that there could be some 'separation' between [the plaintiff's] departure and Traub's first day on October 1, 2013; (2) Kurtz' statements during the August 1, 2013 conversation that he could change the office hours and other working conditions to be 'whatever I want'; (3) locking [the plaintiff] out of the office on September 18, 2013; (4) Traub's testimony that Kurtz told him that he had asked [the plaintiff] to retire and that [the plaintiff] did not take it well; (5) testimony of office staff that Kurtz told them, shortly after September

17, 2013, that [the plaintiff] would not be returning to the office; and (6) evidence that at least some of the office staff believed that [the plaintiff] would not be returning to practice with DOMSA." The court determined that "notwithstanding the lack of a formal, express statement of termination and the defendants' later offer of continued employment, the jur[y] could reasonably have found that the result of the defendants' conduct between August 1, 2013 and September 18, 2013, was a breach of the defendants' obligations to continue to employ [the plaintiff] and prevented him from receiving benefits he was entitled to under the agreement."

The court explained that the defendants' claim of insufficiency was not based on disputed facts, but, instead, that the defendants urged an alternative interpretation of the evidence presented to the jury. We agree. The defendants asked the trial court in their motion to set aside the jury's verdict, and ask this court now, to examine the evidence introduced at trial in a light favorable to them, or to emphasize or give more weight to evidence that supports their position. It was not the role of the trial court, nor is it the role of this court, to do so. The court properly declined the defendants' invitation to revisit the evidence at trial and substitute its judgment for that of the jury.

As to their argument that the evidence at trial was insufficient to prove that the defendants denied the plaintiff the ability to work a schedule of his own choosing,[7] the defendants again reiterate claims of insufficiency that they raised before the trial court in their motion to set aside the verdict, namely, that the provision of the supplementary agreement affording the plaintiff the right to work a schedule of his own choosing applied only when he was a member of DOMSA, not when he became an employee of DOMSA, and that the plaintiff failed to prove that he was denied that right. The court rejected that notion, explaining that it could not "say as a matter of law that (1) this provision of the supplementary agreement is unambiguous and that (2) the jury, therefore, could not possibly have found that the language allowing [the plaintiff] to work a schedule of his choosing applied only to him as a member of DOMSA." The court concluded: "If the jurors did believe it applied to him as an employee, there was sufficient evidence to find that the defendants failed to allow him to work a schedule of his own choosing. The jury reasonably could have found, for example, that Kurtz' reservation of the right to assign patients to [the plaintiff] and other conditions placed on the offer to return to work at DOMSA did not comply with the defendants' contractual obligations to allow [the plaintiff] to continue to work until eighty years of age or to work a schedule of his own choosing." Moreover, evidence was presented that Kurtz told the plaintiff that he would direct patients to him as "he saw fit," the

plaintiff was locked out of the computerized scheduling system of DOMSA, and the plaintiff was not given a key to the office after the locks were changed. We thus agree that there was ample evidence introduced at trial on which the jury could have based a finding that the plaintiff was denied the right to work a schedule of his own choosing.

B

The defendants also argue that the jury's verdict was inconsistent because the jury awarded $2,000,000 for breach of the supplementary agreement and $150,000 for breach of the implied covenant of good faith and fair dealing in that agreement, and the damages awarded on those claims should have been the same because they were based upon identical evidence. We disagree.

"The role of an appellate court where an appellant seeks a judgment contrary to a general verdict on the basis of the jury's allegedly inconsistent answers to . . . interrogatories is extremely limited. . . . To justify the entry of a judgment contrary to a general verdict upon the basis of answers to interrogatories, those answers must be such in themselves as conclusively to show that as [a] matter of law judgment could only be rendered for the party against whom the general verdict was found; they must negative every reasonable hypothesis as to the situation provable under the issues made by the pleadings; and in determining that, the court may consider only the issues framed by the pleadings, the general verdict and the interrogatories, with the answers made to them, without resort to the evidence offered at the trial. . . . When a claim is made that the jury's answers to interrogatories in returning a verdict are inconsistent, the court has the duty to attempt to harmonize the answers." (Emphasis omitted; internal quotation marks omitted.) *Kumah* v. *Brown*, supra, 160 Conn. App. 803–804.

In addressing this claim in the defendants' motion to set aside the verdict, the trial court held: "Breach of contract and breach of the covenant of good faith and fair dealing are separate causes of action and the jury could, as a matter of law, find that [the plaintiff] suffered two separate legal harms from the same facts. . . . The jury could have found on the facts presented at trial that the defendants breached the supplementary agreement in the ways alleged, and did so with dishonest or malicious intent. . . . The jur[y] could have found that [the plaintiff], on the same facts presented, suffered two distinct legal harms and voted to compensate him separately for each harm."

The court acknowledged the validity of the defendants' argument that "the same facts, arising from the same breach of contract, should not give rise to two different awards," but noted that "the counts . . . are not identical because [the plaintiff] has alleged two

separate causes of action which require two separate sets of elements to be proven."[8] The court explained: "While some of the factual allegations overlap between both counts, [the plaintiff's] allegations regarding the breach of the covenant of good faith and fair dealing in the supplementary agreement, read broadly and realistically . . . also allege that Kurtz' alleged breaches of contract were done in bad faith. Moreover, the court advised the jury on the difference between both causes of action, including that the breach of the implied covenant of good faith and fair dealing in the supplementary agreement require that the jury make a finding of bad faith, in addition to finding a breach of contract, to find in favor of [the plaintiff]. . . . Thus, even though [the plaintiff] based both causes of action on similar factual allegations, [the plaintiff] pleaded two different causes of action and could therefore recover two different jury awards—one for the breaches of contract themselves, and one for engaging in bad faith—which would not be inconsistent with each other."

The court further explained: "[T]here is sufficient evidence upon which the jury reasonably could have found that the defendants breached the contract and did so with improper intentions. Evidence upon which the jur[y] could have based each of these findings included: the content of the two August 1, 2013 office meetings; hiring the new associate without [the plaintiff's] consent; the lock out with instructions to staff not to give [the plaintiff] a key; the goodbye card sent by the office staff to [the plaintiff] on September 17, 2013; the argument in the parking lot on September 18, 2013, and the direction to [the plaintiff] that he remove all of his personal belongings from his personal office the following weekend or they would be left 'in the parking lot'; and Kurtz' statement to the staff and others that [the plaintiff] was not coming back to practice at DOMSA. The court assumes that the jur[y] listened to the evidence, listened carefully to the charge, and correctly applied the law to the facts as they found them. The court assumes that the jur[y] rendered two separate awards for two separate legal harms—$2,000,000 for the breach of contract and $150,000 for the separate and distinct legal harm of breaching the contract with evil intent."

It is well settled that, "[a]lthough the covenant of good faith and fair dealing is implied in every contract, a plaintiff cannot state a claim for breach of the implied covenant simply by alleging a breach of the contract, in and of itself. . . . Instead, to state a legally sufficient claim for breach of the implied covenant sounding in contract, the plaintiff must allege that the defendant acted in bad faith." (Citation omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 132 Conn. App. 85, 99, 30 A.3d 38 (2011), aff'd, 311 Conn. 123, 84 A.3d 840 (2014).

Here, as the trial court aptly noted, the factual allegations of the two claims associated with the supplementary agreement certainly overlapped, but they were not identical. The jury's finding of breach of contract did not require a finding of any improper motive by the defendants and thus did not necessarily include damages arising from ill intent.[9] Because the trial court properly fulfilled its duty to harmonize the jury's verdict, we cannot conclude that it abused its discretion in denying the defendants' motion to set aside the jury's verdict on the counts alleging breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing in that agreement.

## II
## AC 41365

We now turn to the plaintiff's challenges to the trial court's judgment setting aside the jury's verdict on his claims of invasion of privacy, tortious interference with business expectancies, violation of CUTPA, and unjust enrichment.[10] Because the court set aside certain portions of the jury's verdict on the ground that the plaintiff failed to prove damages, we begin by setting forth the following pertinent general principles.

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . [Although] there are circumstances in which proof of damages may be difficult and . . . such difficulty is, in itself, an insufficient reason for refusing an award once the right to damages has been established . . . the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate." (Citation omitted; internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 510–11, 28 A.3d 976 (2011).

"Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." (Internal quotation marks omitted.) Id., 511. "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. . . . While the modern tendency is toward greater liberality in the requirements

. . . [for proving lost profits] *it is the unvarying rule that evidence of such certainty as the nature of the case permits should be produced.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 512.

With the foregoing in mind, and guided by the aforementioned principle that "[t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb"; (internal quotation marks omitted) *Kumah* v. *Brown*, supra, 160 Conn. App. 803; we address each of the plaintiff's claims in turn.

A

The plaintiff first claims that the trial court erred in setting aside the jury's verdict and award of damages in the amount of $300,000 on his claim that the defendants invaded his privacy by misappropriating his name after he was terminated from DOMSA. The plaintiff claims that the trial court erred in finding that the sale of his "personal good will" to the defendants included the right to use his name, and that even if the defendants did not have the right to use the plaintiff's name, the plaintiff failed to prove that he suffered any damages as a result of said use. We need not address the issue of whether "personal good will" included the right to use the plaintiff's name because, even if the defendants' use of the plaintiff's name was wrongful, we agree with the trial court that the plaintiff failed to prove that he suffered any damages as a result of the defendants' use of his name.[11]

On this claim, the court instructed the jury as follows: "To recover for this cause of action, the plaintiff must prove that his name was used by the defendants without his consent for the purpose of appropriating to their benefit the commercial value of the plaintiff's name. The damages for such misappropriation are measured by the commercial benefit obtained by the defendants or by the harm to the plaintiff." The plaintiff claims that the trial court disregarded evidence that he presented in support of his claim that the defendants commercially benefitted from the use of his name, such as the facts that several dentists confirmed that they used the referral cards after the plaintiff left DOMSA to refer patients to him, and that DOMSA's employees testified that they received these cards and calls requesting appointments with the plaintiff, but that they were scheduled with Kurtz.

Contrary to the plaintiff's argument, the trial court did, in fact, consider the evidence introduced by the plaintiff. In setting aside the jury's verdict on this claim, the trial court noted that the plaintiff presented evidence that after he left DOMSA, the defendants ordered a new sign for the Danbury office that listed his name and that that sign was displayed for several months.

The defendants did not remove the plaintiff's name from DOMSA's website or stop using patient referral cards listing the plaintiff until several months after the plaintiff left the practice. In the spring of 2014, the defendants purchased an advertisement that included the plaintiff's name in a high school flyer.

The court nevertheless set aside the jury's verdict on the plaintiff's claim of invasion of privacy by misappropriation of his name because "[the plaintiff] presented no evidence at trial of a single patient who came to DOMSA after [the plaintiff]'s departure as a result of the street sign, patient referral cards, website, or high school promotional calendar." The court noted that it had instructed the jury that "damages for this claim are measured by the commercial benefit obtained by the defendants or by the harm to [the plaintiff]," and reasoned that "[s]ince [the plaintiff] presented no proof of a commercial benefit obtained by the defendants through the use of [the plaintiff]'s name after he was no longer a member of DOMSA, the jury could not have found that the defendants misappropriated [the plaintiff]'s name." The trial court further opined that "an award under this claim of damages would also be a duplication of lost earnings, which the jury awarded to [the plaintiff] through its verdict on the claims of violations of the supplementary agreement."

Despite the plaintiff's assertion that the defendants commercially benefitted from the use of his name, he presented no evidence of the commercial value of that benefit. The plaintiff presented no evidence of which patients or how many patients the defendants gained, or how the defendants benefitted commercially, as a result of their use of his name. Because there was no evidentiary basis for the jury's award of $300,000 for the defendants' allegedly wrongful use of the plaintiff's name, the court did not abuse its discretion in setting aside the jury's verdict on the plaintiff's invasion of privacy claim.

B

The plaintiff next claims that the court abused its discretion in setting aside the jury's verdict and award of damages in the amount of $300,000 on his claim of tortious interference with his business expectancies. The trial court set aside the jury's verdict on this claim on the grounds that the plaintiff failed to prove that the defendants tortiously interfered with his actual or expected contractual relationships with his former patients and with referring dentists, and that he suffered an actual loss as a result of any such alleged interference. Because we agree with the trial court's finding that the plaintiff failed to prove that he suffered an actual loss as a result of the defendants' alleged interference with his business expectancies, we conclude that the court did not abuse its discretion in setting aside the jury's verdict and award of damages on this claim.

"It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. . . . It is not essential to such a cause of action that the tort have resulted in an actual breach of contract, since even unenforceable promises, which the parties might voluntarily have performed, are entitled to be sheltered from wrongful interference. . . . It does not follow from this, however, that a plaintiff may recover for an interference with a mere possibility of his making a profit. On the contrary, wherever such a cause of action as this is recognized, it is held that the tort is not complete unless there has been actual damage suffered. . . . To put the same thing another way, it is essential to a cause of action for unlawful interference with business that it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." (Citations omitted; internal quotation marks omitted.) *Villages, LLC* v. *Longhi*, 187 Conn. App. 132, 146–47, 201 A.3d 1098 (2019).

"[T]he proper measure of damages in an action for tortious interference with . . . business expectancies is not the profit to the defendant but rather the pecuniary loss to the plaintiff of the benefits of the prospective business relation." *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 103, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007). "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." (Citation omitted; internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 302 Conn. 510.

Here, the court reasoned: "[T]he court agrees [with the defendants] that [the plaintiff] did not prove by a preponderance of the evidence an ascertainable actual loss as a result of the defendants' wrongful actions. Assuming, as the court must, that the jur[y] believed that the defendants acted wrongfully in the manner in which they advised [the plaintiff's] former patients after his termination from DOMSA, there was still no evidence to support the jury's award of $300,000 in lost revenue [to the plaintiff]. . . . [E]ven if the jury reasonably believed that the defendants diverted [the plaintiff's] former patients in the weeks and months following his termination from DOMSA, and did so with an improper motive, it is clear to the court that the jury could not have awarded [the plaintiff] an additional $300,000 over and above the amount awarded for viola-

tion of the supplementary agreement. The court agrees with the defendants that the evidence at trial showed that the revenue that the jury found was impermissibly diverted would have been the same revenue that [the plaintiff] would have received had he stayed with DOMSA and continued to treat those patients as an associate surgeon. In the court's view, the jury could not have reached its verdict as to tortious interference unless [it] found that the defendants had no right to treat [the plaintiff's] former patients, and found that [the plaintiff] would have earned $300,000 in revenue over and above what he would have earned at DOMSA but for the wrongful termination. The evidence at trial, however, does not support either of these underlying findings." In other words, the court explained: "[T]here is nothing to distinguish the evidence of lost earnings awarded for breach of the supplementary agreement from lost earnings by diversion of former clients. . . . [T]he court agrees with the defendants that the only fair, logical, and reasonable inference to be drawn from the jury's findings and award for tortious interference with business expectancies is that it duplicates the award for breach of the supplementary agreement."

We agree with the trial court's conclusion that the plaintiff failed to prove any actual loss resulting from the defendants' alleged interference with his business expectancies. Similar to the plaintiff's claim of misappropriation of his name, the plaintiff failed to provide the jury with even an estimate of how many or which patients he lost as a result of the defendants' conduct. Without such an evidentiary basis, there is no way to calculate or objectively ascertain the amount of damages sustained by the plaintiff with even a minimal degree of certainty.

Moreover, "[t]he rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury . . . . Connecticut courts consistently have upheld and endorsed the principle that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a waste of society's economic resources to do more than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste. . . . [D]uplicated recoveries must count as overcompensation by any standard. In general, two different measures should not be used to compensate for the same underlying loss . . . . Duplicated recoveries, furthermore, must not be awarded for the same underlying loss under different legal theories. . . . Although a plaintiff is entitled to allege respective theories of liability in separate claims, he or she is not entitled to recover twice for harm growing out of the same transaction, occurrence or event." (Citations omitted; internal quotation marks omitted.) *Rowe* v. *Goulet*, 89

Conn. App. 836, 849, 875 A.2d 564 (2005).

The plaintiff has already recovered for losses that he sustained as a result of his wrongful termination, and that recovery contemplated his lost earnings, which is the same measure of damages for which he sought to be compensated under his claim of tortious interference. Such a duplicated recovery is impermissible. In fact, the court instructed the jury as follows: "You must consider the issue of damages separately for each cause of action for which you find liability—whether it's the plaintiff's or defendants'—without regard for any damages that you may have awarded in any other cause of action. The court will ensure that either party does not recover more than once for the same loss, even if that party prevails on two or more causes of action." In setting aside the jury's verdict on the plaintiff's claim of tortious interference, the trial court properly ensured that the plaintiff did not recover twice for the same loss.

C

The plaintiff also claims that the trial court erred in setting aside the jury's verdict and award of damages in the amount of $100,000 for violations of CUTPA. The jury found that the defendants violated CUTPA by failing to obtain the plaintiff's vote prior to hiring Traub; failing to disclose business transactions made on behalf of DOMSA, including settlement of the Medicaid audit; wrongfully terminating the plaintiff before he reached eighty years old; failing to allow the plaintiff to work a schedule of his choosing; intentionally interfering with the plaintiff's business relations and economic expectancies; and misappropriating the plaintiff's name. In setting aside the jury's CUTPA verdict, the trial court explained that it should not have instructed the jury on the plaintiff's CUTPA claims because they arose from intracorporate employment disputes that are not subject to CUTPA. The court also found that the plaintiff failed to prove that he sustained any ascertainable loss as a result of the defendants' alleged CUTPA violations. The plaintiff's challenge to the trial court's finding that the defendants' conduct was intracorporate is focused on the defendants' post-termination conduct of allegedly diverting the plaintiff's patients from him and misappropriating his name. Even if those claims were viable under CUTPA, we agree that the plaintiff failed to prove that he sustained any ascertainable loss as a result of the defendants' alleged CUTPA violations.[12]

"[Section] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 880, 124 A.3d 847 (2015).

"To give effect to its provisions, § 42-110g (a) of the

act establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . .

"The ascertainable loss requirement [of § 42-110g] is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief. . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation. . . . CUTPA, however, is not limited to providing redress only for consumers who can put a precise dollars and cents figure on their loss . . . as the ascertainable loss provision do[es] not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case. . . . Rather . . . [d]amage . . . is only a species of loss . . . hence [t]he term loss necessarily encompasses a broader meaning than the term damage. . . . Accordingly . . . for purposes of § 42-110g, an ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the *amount* of the actual loss. . . .

"Of course, a plaintiff still must marshal *some* evidence of ascertainable loss in support of her CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Marinos* v. *Poirot*, 308 Conn. 706, 713–14, 66 A.3d 860 (2013).

"A plaintiff also must prove that the ascertainable loss was caused by, or a result of, the prohibited act. General Statutes § 42-110g (a) . . . . When plaintiffs seek money damages, the language as a result of in § 42-110g (a) requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff. . . . [P]roximate cause is [a]n actual cause that is a substantial factor in the resulting harm . . . . The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, supra, 318 Conn. 882–83.

On appeal, the plaintiff argues: "Deceit permeated the defendants' actions from the time Kurtz took over as manager of the practice in 2009 until the defendants successfully drove [the plaintiff] out of the practice and essentially destroyed his career. Kurtz lied to get [the plaintiff]'s patients and referral sources to continue to provide the business after [the plaintiff] left." Although

the record supports the plaintiff's allegations that some of the plaintiff's patients called DOMSA after he left and were not referred to him, the plaintiff failed to marshal any evidence of an ascertainable loss as a result of that conduct. The plaintiff did not introduce any evidence of even an estimate of the number of patients that he lost, or financial loss that was attributable to the loss of those patients. In his brief to this court, the plaintiff argues simply that "his W-2s and [the] defendants' earning records" established an ascertainable loss. Although those documents demonstrate a reduction in the plaintiff's earnings following his termination from DOMSA, the plaintiff failed to establish that the defendants' alleged conduct of diverting patients from him and using his name proximately caused any loss that can be gleaned from an examination of those documents. We thus conclude that the trial court did not abuse its discretion in setting aside the jury's verdict on the plaintiff's CUTPA claim.

D

The plaintiff also challenges the trial court's judgment setting aside the jury's verdict and award of damages in the amount of $150,000 on his claim of unjust enrichment. It is well-settled that a plaintiff may recover for unjust enrichment when a contract remedy is unavailable, to the extent that the defendant has unjustly profited at the plaintiff's expense. *Horner* v. *Bagnell*, 324 Conn. 695, 707–708, 154 A.3d 975 (2017). In other words, breach of contract and unjust enrichment are mutually exclusive theories of recovery. *Russell* v. *Russell*, 91 Conn. App. 619, 638, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005).

Here, the plaintiff alleged that the defendants were unjustly enriched "as a result of their squeeze out and wrongful termination of . . . [him] and their scheme to divert patients from . . . [him]." Because the plaintiff had already recovered for wrongful termination under his claim that the defendants breached the supplementary agreement, the trial court found, and we agree, that he could not again recover under an unjust enrichment theory. We therefore conclude that the trial court properly set aside the jury's verdict on the plaintiff's claim of unjust enrichment.

E

The plaintiff also claims that the trial court erred in dismissing his claims for breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in the operating agreement on the ground that the court lacked subject matter jurisdiction because he lacked standing to bring those claims. We disagree.

The jury found that the defendants breached the operating agreement and the implied covenant of good faith and fair dealing in the operating agreement by

failing to disclose to the plaintiff business transactions made on behalf of DOMSA, specifically, the settlement of the Medicaid audit, and by failing to obtain the plaintiff's vote prior to hiring Traub. The jury did not award any compensatory damages to the plaintiff on his claim of breach of the operating agreement, but did indicate that the plaintiff was entitled to punitive damages. It awarded him damages in the amount of $150,000 for breach of the implied covenant of good faith and fair dealing in that agreement.

On February 17, 2017, the defendants filed a motion to dismiss the plaintiff's claims for breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in the operating agreement for lack of subject matter jurisdiction. The defendants claimed, inter alia, that the plaintiff lacked standing to bring those claims because the alleged violations of the plaintiff's rights to be advised of DOMSA's finances and to vote on the hiring of Traub did not cause the plaintiff any harm, and he therefore was not aggrieved.[13] The defendants further argued that even if those violations did cause harm, any harm sustained by the plaintiff was derivative of, and indistinguishable from, the harm sustained by DOMSA.

On January 26, 2018, the trial court granted the defendants' motion to dismiss, by way of a written memorandum of decision, on the ground that the plaintiff did not suffer any injury as a result of the two claims related to the operating agreement that was separate and distinct from injury suffered by DOMSA, and thus that the claims of breach of the operating agreement should have been brought as derivative actions. The trial court thus concluded that it lacked subject matter jurisdiction over the plaintiff's claims of breach of the operating agreement and breach of the implied covenant of good faith and fair dealing in the operating agreement because the plaintiff did not have standing to bring them.

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . [A] claim that a court lacks subject matter jurisdiction may be raised at any time during the proceedings . . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. . . .

"[S]tanding is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Citations omitted; internal quotation marks omitted.) *Wiederman* v. *Halpert*, 178 Conn. App. 783, 793–94, 176 A.3d 1242 (2017), cert. granted on other grounds, 328 Conn. 906, 177 A.3d 1161 (2018).

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]." (Internal quotation marks omitted.) Id., 794–95.

"[A]s a general rule, a plaintiff lacks standing unless the harm alleged is direct rather than derivative or indirect. . . . [I]f the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. Where, for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." (Citation omitted; internal quotation marks omitted.) Id., 795.

"A limited liability company is a distinct legal entity whose existence is separate from its members. . . . [It] has the power to sue or to be sued in its own name; see General Statutes §§ 34-124 (b) and 34-186; or may be a party to an action brought in its name by a member or manager. . . . A member or manager, however, may not sue in an individual capacity to recover for an injury based on a wrong to the limited liability company." (Internal quotation marks omitted.) *Padawer* v. *Yur*, 142 Conn. App. 812, 817, 66 A.3d 931, cert. denied, 310 Conn. 927, 78 A.3d 145 (2013).

On appeal, the plaintiff challenges the trial court's determination that he lacked standing to bring his claims related to the operating agreement. In his opposition to the defendants' motion to dismiss, and in his "Omnibus Statement of Facts in Support of [His] Opposition to [the] Defendants' Post-Trial Motions," the plaintiff argued that he suffered loss as a result of Kurtz' failure to inform him of the Medicaid reimbursement by virtue of the fact that, at that time, he retained a one percent interest in DOMSA, and because he continued to treat Medicaid patients "without knowing that Medicaid was not reimbursing [DOMSA] for his work," the loss of Medicaid revenue to DOMSA caused him to suffer financial loss. It cannot reasonably be disputed that such a loss was derivative of a loss to DOMSA. To the extent that the plaintiff now argues that his loss was not derivative "because the defendants did not compensate him for his treatment of Medicaid patients

over a two-year period and then in 2013," the trial court properly found that "[t]he only evidence at trial was that [the plaintiff] continued to receive his 50 percent share of the net collections for his services at DOMSA." The trial court concluded that "there was no evidence brought forth at trial that [the plaintiff] was harmed in any way by the results of the Medicaid audit." Consequently, the plaintiff has failed to prove that he was aggrieved by Kurtz' failure to inform him of the Medicaid audit.

Also in his opposition to the defendants' motion to dismiss, the plaintiff alleged that "[t]he hiring of Traub proved . . . costly to [the plaintiff]—since it directly led to his termination from DOMSA" and thereby caused him to lose "millions of dollars in income." This claim is belied by the record. Although the plaintiff should have been afforded the opportunity to vote on the decision to hire Traub pursuant to the terms of the operating agreement, he has not claimed, nor does the evidence presented at trial reflect, that he opposed that hiring decision. Indeed, the evidence presented at trial indicated that the plaintiff and Kurtz agreed to advertise for a new associate. Moreover, we agree with the trial court's finding that the plaintiff "introduced no evidence of a direct connection between the hiring of Traub and [the plaintiff]'s termination at trial or evidence that Kurtz employed Traub as a first step in forcing [the plaintiff] out of DOMSA." The plaintiff failed to prove that he was specially and injuriously affected by Kurtz' failure to secure his approval of Traub's hiring, and he, therefore, lacked standing to claim that the defendants breached the operating agreement or the implied covenant of good faith and fair dealing in that agreement. We therefore conclude that the trial court properly dismissed these claims.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The complete titles and the terms of these documents will be set forth herein.

[2] Prior to trial, the plaintiff withdrew his claims of slander, and intentional and negligent infliction of emotional distress; and the defendants withdrew the counts of their counterclaim alleging breach of the operating agreement. After the plaintiff rested his case, the court directed a verdict in favor of the defendants on the plaintiff's claim of breach of the purchase and sale agreement. The plaintiff abandoned his claim seeking a declaratory judgment that he is no longer bound by the restrictive covenant contained in the operating agreement.

[3] The defendants withdrew their claims related to the operating agreement prior to trial.

[4] The jury also found that the defendants breached the operating agreement, violated CFEPA, and breached their fiduciary duty to the plaintiff, but awarded the plaintiff no damages under those counts.

[5] The jury also found that the plaintiff was entitled to punitive damages for breach of the supplementary agreement and breach of the implied covenant of good faith and fair dealing in the supplementary agreement. The trial court set aside that determination, and the plaintiff has not challenged that ruling on appeal.

[6] Because we conclude that the evidence was sufficient to prove that the plaintiff was terminated, we do not reach the defendants' additional claim that the evidence was insufficient to support the jury's award of damages

if the only breach of the supplementary agreement was the prevention of the plaintiff from working a schedule of his choosing.

[7] We note that because the jury's award of damages was not apportioned between the two claimed breaches of the supplementary agreement, the jury's verdict may be sustained on the basis of the evidentiary sufficiency of his first allegation under the general verdict rule.

[8] The trial court explained: "In count three, [the plaintiff] alleged that Kurtz, in his professional capacity, violated the supplementary agreement by 'wrongfully terminating . . . [the plaintiff] . . . prior to his eightieth birthday . . . [failed] to allow . . . [the plaintiff] to work a schedule of his choosing . . . and . . . [failed] to compensate . . . [the plaintiff] for fifty [percent] . . . of [his] net collections . . . .' Count seven, regarding the breach of the implied covenant of good faith and fair dealing in the supplementary agreement, alleged that the defendants were obligated to not 'take any improper action which would deprive . . . [the plaintiff] of the benefit of his bargain . . . [Kurtz'] aforesaid acts and omissions [alleged in count three] . . . were breaches . . . of the aforesaid covenant of good faith and fair dealing.' "

[9] To the extent that the defendants argue that the awards of damages for breach of contract and breach of the implied covenant of good faith and fair dealing are impermissibly duplicative, that issue cannot be determined based upon the jury's responses to the interrogatories. Although the jury found that the defendants breached the contract and the implied covenant of good faith and fair dealing by terminating the contract and denying the plaintiff the right to work the schedule of his choosing, it is possible one award of damages was for wrongful termination, while the other for usurping the plaintiff's schedule.

[10] The plaintiff claims that if this court restores the jury's verdict on any of these claims, he is entitled to attorney's fees and punitive damages. Because we affirm the court's judgment setting aside these portions of the jury's verdict, we do not reach this argument.

[11] The issue of whether "personal good will" includes the use of one's name has not been decided in Connecticut.

[12] Because we conclude that the trial court correctly concluded that the plaintiff failed to establish any ascertainable loss, we need not address the plaintiff's claim that the court erred in finding that the defendants' conduct arose from intracorporate employment disputes that are not subject to CUTPA.

[13] The defendants also claimed that the plaintiff's claims regarding the operating agreement were moot. Because we agree with the trial court's determination that the plaintiff lacked standing to bring these claims, we need not address the defendants' mootness argument.